## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **ANNETTE JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:25-cv-120-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Annette Jones brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On September 8, 2021, Ms. Jones protectively filed an application for benefits under Title II of the Act, alleging disability beginning August 15, 2021. R. 17, 87–99, 267–76. Ms. Jones alleges disability due to: blind or low vision, fibromyalgia, bipolar, anxiety, and mood disorder. R. 87.

1

The Social Security Administration ("SSA") initially denied Ms. Jones's application on July 21, 2022, and again upon reconsideration on April 27, 2023. R. 17, 86–111. On June 26, 2023, Ms. Jones filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 17, 132–33. That request was granted. R. 185–89. Ms. Jones received a telephone hearing before ALJ Clarence Guthrie on January 2, 2024. R. 17, 49–85. On March 20, 2024, ALJ Guthrie issued a decision, finding that Ms. Jones was not disabled from August 15, 2021, through the date of the decision. R. 14–42. Ms. Jones was forty-three years old at the time of the ALJ decision. R. 40, 42.

Ms. Jones appealed to the Appeals Council, which denied her request for review on November 26, 2024. R. 1–3. After the Appeals Council denied Ms. Jones's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On January 23, 2025, Ms. Jones sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.     The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done "for pay or

profit." 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. 20 C.F.R. § 404.1520(a)(4)(ii), (c). *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 404.1525, 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ finds the claimant unable to perform past relevant

work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Jones would meet the insured status requirements of the Act through December 31, 2024. R. 18, 19. Next, the ALJ found that Ms. Jones "has not engaged in substantial gainful activity since August 15, 2021, the alleged onset date." R. 19 (emphasis omitted). The ALJ decided that Ms. Jones had the following severe impairments: obesity, degenerative disc disease, fibromyalgia, loss of central visual acuity, depression, bipolar disorder, anxiety disorder, and amphetamine use disorder. R. 20. The ALJ found that Ms. Jones had these "non-severe" impairments that "have no more than a minimal effect on [her] ability to meet the basic demands of work activity": hypertension, hyperlipidemia, asthma, allergic rhinitis, and diabetes mellitus. R. 20. Overall, the ALJ determined that Ms. Jones "does not have an impairment or combination of impairments that

meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 22 (emphasis omitted).

The ALJ found that Ms. Jones's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 28. The ALJ found that Ms. Jones "has the residual functional capacity to perform light work" with certain limitations. R. 27 (emphasis omitted). The ALJ determined that Ms. Jones can: frequently stoop; occasionally kneel, crouch, or crawl; occasionally be exposed to extreme cold, extreme heat, excessive irritants, poorly ventilated areas, and chemicals; and avoid ordinary hazards in the workplace. R. 27. The ALJ determined that Ms. Jones cannot: climb ladders, ropes, or scaffolds; or be exposed to workplace hazards such as moving mechanical parts and high, exposed places. R. 27. The ALJ determined that Ms. Jones can understand, remember, and carry out detailed, but not complex instructions; cannot perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas; can tolerate occasional interaction with the public and occasional interaction with co-workers and supervisors; and can deal with occasional changes in the work setting. R. 27.

The ALJ determined that Ms. Jones's past relevant work was that of a certified nurse assistant, cloth winder, and label coder. R. 39. The ALJ determined Ms. Jones is "unable to perform any past relevant work." R. 39 (emphasis omitted).

According to the ALJ, Ms. Jones is "a younger individual" and has "at least a high school education," as those terms are defined by the regulations. R. 40 (emphasis omitted). The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability" in this case. R. 40 (emphasis omitted). Because Ms. Jones's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Ms. Jones could perform. R. 41. That expert concluded that there were indeed a significant number of such jobs in the national economy, such as a cleaner, housekeeping and a garment sorter. R. 41.

Based on these findings, the ALJ concluded that Ms. Jones was not under a disability as defined in the Act, from August 15, 2021, through March 20, 2024, the date of the decision. R. 41–42. Ms. Jones now challenges that decision.

## III. Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Walker v. Soc. Sec. Admin, Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the

Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision "is reasonable and supported by substantial evidence." *See Martin*, 894 F.2d at 1529 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *Id*. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV.    Discussion

Ms. Jones raises five arguments on appeal. *First*, Ms. Jones argues that "[t]he ALJ failed to properly evaluate the medical opinion evidence." Doc. 11 at 2. *Second*, Ms. Jones argues that the ALJ's residual functional capacity determination was not properly supported. *Id.* at 8. *Third*, Ms. Jones argues that "the ALJ erred by failing to reconcile an apparent conflict between the Dictionary of Occupational Titles . . . and the testimony of the vocational expert . . . regarding the jobs found for [Ms. Jones] at step five." *Id.* at 10 (emphasis omitted). *Fourth*, Ms. Jones argues that "[t]he ALJ relied on a flawed hypothetical question to the vocational expert." *Id.* at 2. *Fifth*, Ms. Jones argues that "[t]he ALJ failed to properly evaluate [her] subjective statements." *Id.*

## A. The ALJ's Evaluation of Ms. Jones's Medical Opinion Evidence

The SSA has revised the applicable regulations related to medical opinion evidence. The SSA's new regulations, promulgated in 2017, do away with the hierarchy of medical opinions and the treating source rule. 20 C.F.R. § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id*. And the ALJ "will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the purpose and extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* § 404.1520c(c). Supportability and consistency are the most important of the five factors. *Id.* § 404.1520c(b)(2). Supportability measures how a medical source presents "objective medical evidence and supporting explanations" "to support his or her medical opinion(s)." *Id.* § 404.1520c(c)(1). Consistency measures how a medical opinion compares to "evidence from other medical sources and nonmedical sources in the claim." *Id.* § 404.1520c(c)(2). An ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . in [his] . . . decision." *Id.* § 404.1520c(b)(2). The ALJ may explain how he considered the remaining factors, but he is not required to do so. *Id.* The ALJ is not required to use "magic words" or follow a particular formula to articulate his consideration of the factors. *See id.* § 404.1520c; *Thaxton v. Kijakazi*, No. 1:20-cv-00616-SRW, 2022 WL 983156, at *8 (M.D. Ala. Mar. 30, 2022).

Ms. Jones argues that the ALJ failed to accord proper weight to an August 22, 2023, Clinical Assessment of Pain report and Medical Questionnaire Regarding Limitations completed by Ivonne Joiner, C.R.N.P. Doc. 11 at 3; *see also* R. 976–77.

In the Clinical Assessment of Pain, N.P. Joiner made the following selections regarding her assessment of Ms. Jones's pain:

> Question: "To what extent is pain of significance in the treatment of this patient?"
> Selected Response: "Pain is present to such an extent as to be distracting to adequate performance of daily activities or work."
>
> Question: "To what extent will physical activity, such as walking, standing, sitting, bending, stooping, moving of extremities, etc., increase the degree of pain experienced by this patient?"
> Selected Response: "Greatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of task."
>
> Question: "In your best judgment, to what extent will the side effects of prescribed medications impact upon this patient's ability to perform his/her work?"
> Selected Response: "Should be able to perform job duties without any decrease in work effectiveness."

R. 976.

In the Medical Questionnaire Regarding Limitations, N.P. Joiner opined that Ms. Jones's "medical conditions preclude her ability to maintain concentration, persistence, and pace for two-hour periods." R. 977. N.P. Joiner also opined that Ms. Jones's "medical conditions preclude her ability to perform activities within a

schedule, maintain regular attendance and be punctual within customary tolerances on a continuous basis." R. 977. N.P. Joiner affirmed that Ms. Jones's "medical conditions require her to lie down during the day" and explained that "[s]ometimes patient needs to lie down to alleviate pain." R. 977. N.P. Joiner assessed that, in an eight-hour workday, Ms. Jones could:

- Sit for one hour;
- Stand or walk for zero hours.

R. 977. However, next to this assessment, N.P. Joiner wrote "N/A patient does not work." R. 977. Likewise, N.P. Joiner did not answer how many days per month Ms. Jones was "likely to be absent from work as a result of the impairments" and instead wrote "N/A pt does not work." R. 977. Finally, N.P. Joiner did not include any additional comments. R. 977.

The ALJ considered and discussed N.P. Joiner's medical opinion in his residual functional capacity findings:

> Ivonne R. Joiner, CRNP, provided a statement indicating that the claimant's pain is present to such extent that it is distracting to adequate performance of daily activities or work; her pain is increased to the extent that it causes off task behavior;[] but she should be able to perform job duties without any decrease in work effectiveness. Ms. Joiner also noted that the claimant can maintain concentration, persistence, and pace for 2-hour periods; her medical conditions preclude her ability to perform activities within a schedule[], maintain regular attendance, and be punctual within customary tolerances on a continuous basis; she has medical conditions that require

11

her to lie down during the day such as pain. Ms. Joiner also noted that the claimant can sit for a total of 1 hour in an 8-hour workday and stand and/or walk for 0 hours in an 8-hour workday but noted that these were not applicable because the claimant is not working. I am not persuaded by this statement, as it is not fully supported by her examination findings after only two visits. It is not until she established primary care with Ms. Joiner after her accident that she had abnormal physical findings such as tenderness and limited range of motion of the cervical and lumbar spine, positive straight leg raise testing, irregular gait with stiff ambulation, but she had intact sensation throughout. Additionally, Ms. Joiner provided conflicting statements regarding distractibility and off task behavior, as she first noted that it would cause off task behavior, but noted that the claimant would be able to perform duties without any decrease in work effectiveness.

Ms. Joiner's statement is also inconsistent with the evidence of record such as orthopedic records that show that the claimant reported significant improvement of her symptoms of neck, back, and right shoulder pain, with physical findings demonstrating her reported improvement. Even though pain management records show decreased range of motion and tenderness of the cervical, thoracic, and lumbar spine, the claimant had full strength of all extremities, full range of motion of all other joints, normal gait, intact sensation, and normal reflexes. Finally, good cause exists to discount the opinion of Nurse Joiner because this opinion consists of a series of checked boxes on a form, devoid of detail with virtually no explanation, and clearly contradicted by her contemporaneous treatment records.

R. 36 (citations omitted).

Ms. Jones argues that "[t]he ALJ erred by criticizing N.P. Joiner's opinions as a 'series of checked boxes on a form, devoid of detail with virtually no

12

explanation, and clearly contradicted by her contemporaneous treatment records.'" Doc. 11 at 4 (quoting R. 36). Additionally, Ms. Jones argues that the ALJ erred by "fail[ing] to explain why th[e] supportive explanation"—chronic pain—"did not support the opinions in violation of 20 C.F.R. § 404.1520c(c)(1)." Doc. 11 at 5. Ms. Jones also argues that "[t]he ALJ erred by failing to compare the opinions of N.P. Joiner with . . . significant objective and clinical abnormalities in violation of the Regulations at 20 C.F.R. § 404.1520c(c)(2)." Doc. 11 at 6. Ms. Jones argues that "[t]he ALJ also erred by finding the opinions from N.P. Joiner internally inconsistent" by "ignor[ing] the context of these responses." *Id.* at 6–7. Finally, Ms. Jones argues that "the ALJ improperly discounted the opinions from N.P. Joiner because Ms. Jones had some response to treatment." *Id.* at 7.

The Commissioner argues that "the ALJ properly evaluated the medical opinion of Ms. Joiner, which was so limited in explanation that the ALJ had no basis to accept the limitations opined upon." Doc. 15 at 8. The Commissioner argues that "[t]he ALJ's analysis adhered to the regulations" and "applied the most important factors of supportability and consistency." *Id.* at 8, 10.

As an initial matter, the ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 27. Additionally, he stated: "I fully considered the medical opinions . . . in accordance with 20 CFR 404.1520c but because I have the benefit of the entirety of the claimant's medical

records and the additional testimony and evidence presented at the hearing, I rarely find opinions to be simply 'persuasive' or 'not persuasive,' either accepting them word-for-word or rejecting them altogether." R. 34. The ALJ articulated how persuasive he found the opinion, as required by the regulations. R. 36 ("I am not persuaded by this statement . . . ."); *see* 20 C.F.R. § 404.1520c(b). The ALJ also articulated how consistent he found the opinion, as required by the regulations. R. 36 ("Ms. Joiner's statement is also inconsistent with the evidence of record . . . ."); *see* 20 C.F.R. § 404.1520c(b).

The ALJ applied the correct legal standards in evaluating N.P. Joiner's opinion, and substantial evidence supports his finding that it was not persuasive because "it is not fully supported by her examination findings after only two visits" and is "clearly contradicted by her contemporaneous treatment records." *See* R. 36. In assessing supportability, the ALJ contrasted N.P. Joiner's care before and after Ms. Jones's accident, noting that it was not until after Ms. Jones's accident "that she had abnormal physical findings." R. 36. Additionally, the ALJ referenced N.P. Joiner's "conflicting statements regarding distractibility and off task behavior." R. 36. In assessing consistency, the ALJ referenced Ms. Jones's orthopedic records and pain management records. R. 36. Specifically, the ALJ noted that the orthopedic records show that Ms. Jones "reported significant improvement of her symptoms of neck, back, and right shoulder pain, with physical findings demonstrating her

14

reported improvement." R. 36. And the ALJ noted that although "pain management records show decreased range of motion and tenderness of the cervical, thoracic, and lumbar spine, [Ms. Jones] had full strength of all extremities, full range of motion of all other joints, normal gait, intact sensation, and normal reflexes." R. 36. Finally, the ALJ opined that N.P. Joiner's "opinion consists of a series of checked boxes on a form, devoid of detail with virtually no explanation." R. 36.

Before the ALJ made this finding with respect to N.P. Joiner's medical opinion, the ALJ detailed Ms. Jones's hearing testimony, history of back pain, findings from a physical consultative examination, primary care records, diagnostic testing, orthopedic records, pain management records. R. 28–33. In making this finding, the ALJ detailed Ms. Jones's medical treatment including her visits to: N.P. Joiner at Southside Medical Clinic, *see* R. 30, 1180–94; Ortho Sports Associates, *see* R. 30, 1159–78; and Alabama Anesthesiology and Pain Management, *see* R. 30–31, 1112–38, 1217–46. Ms. Jones presented to N.P. Joiner on May 2, 2023 to establish care. R. 1184–86. At the visit, Ms. Jones reported her involvement in an April 2023 motor vehicle accident, which resulted in neck pain, headache, back pain, shoulder pain, and lower extremity pain. R. 1186. The physical examination revealed tenderness, pain with motion, and muscle rigidity in her neck; abnormal motor strength; tenderness; limited range of motion; positive straight leg test; irregular gait; and stiffness with ambulation. R. 1187. N.P. Joiner directed Ms. Jones to return to

the clinic as needed. R. 1188. Ms. Jones presented to N.P. Joiner on July 5, 2023 complaining of "back pain" that had "been going on since 05/02/2023." R. 1180. Mr. Jones reported that since she was involved in a motor vehicle accident, she "has had no improvement in lower back pain" despite orthopedic care and physical therapy. R. 1182. The physical examination revealed "normal tone and motor strength," "no contractures, malalignment, or bony abnormalities," but tenderness, "pain to lower back upon hip and knee flexion," and edema. R. 1183. N.P. Joiner directed Ms. Jones to return to the clinic as needed. R. 1183. N.P. Joiner's medical records include imaging results, which the ALJ detailed in his residual functional capacity finding. *See* R. 30, 1189–94.

Under the new regulations, the ALJ adequately accounted for his finding regarding N.P. Joiner's medical opinion. The ALJ's decision reflects that he considered N.P. Joiner's own examination findings in his analysis. R. 30. The ALJ expressly discussed and considered N.P. Joiner's "abnormal physical findings" as well as the imaging results included in her records. R. 30. The ALJ specifically discussed the timing of Ms. Jones's visits to N.P. Joiner in conjunction with her injuries suffered in a motor vehicle accident. R. 36. Additionally, the ALJ cited other medical evidence in the record that was inconsistent with N.P. Joiner's medical opinion. *See* R. 30–31. Thus, the ALJ properly addressed both the supportability and consistency factors.

To the extent Ms. Jones criticizes the ALJ's statement regarding the "checked boxes" on the medical opinion form, the ALJ did not err: he did not solely remark on the nature of the form but rather opined that the nature of the form coupled with N.P. Joiner's lack of written explanations or additional comments, the medical opinion was "devoid of detail with virtually no explanation." *See* R. 36.

The ALJ thoroughly explained the medical records regarding chronic pain. *See* R. 29 ("She also reported compliance with medications such as for fibromyalgia with reports of effectiveness and no adverse side effects."); R. 30 ("Orthopedic progress notes after completion of physical therapy show that she improved and had no major complaints with no abnormal physical findings on examination.") (citation omitted); R. 30 (reflecting that pain management records show "up to 40% reduction in pain with medications, improved sleep, and overall pain management goals met") (citation omitted). The ALJ summarized the medical finding both before and after Ms. Jones's motor vehicle accident and noted "significant improvement," "completing physical therapy," and "some improvement with treatment," while still recognizing "abnormal physical findings regarding tenderness and decreased range of motion" before finding that she could perform work at a light exertion. R. 33.

With respect to Ms. Jones's criticism of the ALJ's comment regarding off-task behavior, there is no error. *First*, this is one data point of many upon which the ALJ based his persuasiveness determination. *Second*, the record reflects that Ms.

Jones was treated with medication for pain, *see* R. 29–30, and that it was effective without the hinderance of side effects. Thus, N.P. Joiner's statement that pain would cause off-task behavior is inconsistent with the record.

Finally, the ALJ did not discount the opinion of N.P. Joiner because Ms. Jones had "some response to treatment." *See* Doc. 11 at 7. Rather, the ALJ properly placed N.P. Joiner's treatment and examination of Ms. Jones in context to her motor vehicle accident, orthopedic treatment (including completed physical therapy), and pain management treatment.

The ALJ applied the correct legal standards in evaluating N.P. Joiner's opinion, and substantial evidence supports his finding that it was not persuasive. Ms. Jones has not shown that the ALJ erred in her consideration of the medical opinion evidence.

## B. The ALJ's Residual Functional Capacity Determination

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing

basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

Social Security Ruling 85-15 ("SSR 85-15") provides guidance for evaluating the impact of nonexertional impairments, including mental impairments, on a claimant's ability to perform work. SSR 85-15 at *1, 1985 WL 56857 (January 1, 1985). "The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. This decision requires careful consideration of the assessment of" the residual functional capacity. *Id.* at *4. "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.*

Ms. Jones argues that after rejecting the medical opinion from N.P. Joiner, the ALJ "fail[ed] to credit any other medical evidence concerning Ms. Jones' physical functioning" and "it is unclear what evidence supports the light [residual functional

capacity] determination." Doc. 11 at 8. Further, Ms. Jones argues that "[t]he ALJ failed to cite to any *specific* medical facts or even persuasive non-medical evidence in the record that supports his physical [residual functional capacity] determination." *Id.* Finally, Ms. Jones argues that "[t]he ALJ also failed to properly determine Ms. Jones' mental [residual functional capacity]." *Id.* at 9.

The Commissioner argues that "a plain reading of the ALJ's decision shows a thorough consideration of the longitudinal record and conclusions consistent with the ALJ's role." Doc. 15 at 12. With respect to mental functions, the Commissioner argues that Ms. Jones "misread[s] . . . the record." *Id.* at 13. And the Commissioner argues that "[t]he ALJ . . . accounted for the moderate limitations in the [residual functional capacity] finding." *Id.*

In making his residual functional capacity determination, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "the medical opinions and prior administrative medical findings." R. 27. The ALJ discussed Ms. Jones's benefits application, Functions Reports, and hearing testimony. R. 28. Then, the ALJ detailed the "objective medical evidence," the "longitudinal medical evidence," physical consultative examination findings, primary care records, emergency care records, orthopedic care records, pain management care records, and ophthalmic care records. R. 28–33. The ALJ stated:

Overall, the objective medical evidence does not fully support the claimant's allegations of disabling symptoms since the alleged onset date. While she alleges neck and back pain limiting her functional ability, imaging studies show no more than mild degenerative changes.

Additionally, her examination findings since the alleged onset date through April 2023, show no more than one-time abnormal findings of paraspinal muscle tenderness, otherwise, she had normal physical findings. It is not until April 2023, that she had increased symptoms after being involved in a motor vehicle accident, but her work up was unremarkable, including imaging studies of the cervical, thoracic, and lumbar spine. Moreover, she reported significant improvement during her orthopedic visits after completing physical therapy, with examination findings consistent with her reported improvement. The orthopedic findings and reported improvement is inconsistent with primary care visits findings during the same month that show abnormal physical findings. However, I have also considered pain management records that show abnormal physical findings regarding tenderness and decreased range of motion, but otherwise, she had normal strength, gait, sensation, and reflexes. Progress notes also show that she reported some improvement with treatment. Even though the claimant alleges blindness or low vision, her workup was unremarkable and there is no objective evidence to explain her reported blindness. Additionally, no medical professional or their staff noted that the claimant had difficulty navigating through their facilities due to low vision.

The claimant also alleges disabling mental impairment symptoms. Indeed, the record shows that she was admitted for inpatient psychiatric care in two occasions, one before the alleged onset date and the second one nearly two years later. However, the first one occurred in a setting of non-compliance with medication for over 10 years and using amphetamines. I also note that there is no evidence of outpatient follow up care since October 2022, even though

she alleges disabling symptoms. In any case, her mental
status examination[s] were normal even though she was
depressed and had anxious affect. Additionally, she stated
that she is able to attend classes for medical coding and
billing, despite her reported problems with concentration
and attention. Primary care examinations show that she
had normal attention, concentration, memory, mood, and
affect.

R. 32–33 (citations omitted). And the ALJ found that Ms. Jones's "activities of daily

living further diminish the persuasiveness of her allegations" and "are consistent

with the ability to perform a range of light work." R. 33. The ALJ concluded:

> Consistent with the evidence discussed above and
> considering the effects of her medically determinable
> impairments along with her obesity on exertional
> functions, and demonstrated normal strength, I find that
> she can perform work at a light exertion. I have also taken
> into account the effects of her obesity on postural and non-
> exertional functions, along with possible symptom
> exacerbating factors, and safety precautions for possible
> delayed reaction times due to medication side effects and
> pain in finding[] that she can never climb ladders, ropes,
> or scaffolds; she can frequently stoop, and occasionally
> kneel, crouch, or crawl; she can occasionally be exposed
> to extreme cold, extreme heat, excessive irritants such as
> fumes, odors, dust, and gases, poorly ventilated areas,
> chemicals as defined in the Selected Characteristics of
> Occupations of the DOT; she can never be exposed to
> workplace hazards such as moving mechanical parts and
> high, exposed places. Because of her loss of visual acuity
> of unknown etiology, I find that she can avoid ordinary
> hazards in the workplace (e.g., boxes on floor, doors ajar,
> etc.). In considering the claimant's reported mental
> impairment related symptoms, despite normal mental
> status exams, I find that she can understand, remember,
> and carry out detailed, but not complex instructions; she
> cannot perform work requiring a specific production rate,

> such as assembly line work, or work that requires hourly
> quotas; she can tolerate occasional interaction with the
> public, and occasional interaction with coworkers and
> supervisor; she can deal with occasional changes in the
> work setting.

R. 33–34.

Regarding Ms. Jones's mental residual functional capacity, the ALJ discussed the state agency psychological consultation at the initial level and upon reconsideration, mental health treatment records, and "other evidence such as [Ms. Jones's] reported daily activities that demonstrate a greater functional ability." R. 36–39. With respect to the "non-examining state agency psychologists" cited by Ms. Jones, *see* Doc. 11 at 9, the ALJ specifically stated that Dr. Sadovnik "opined that the claimant can understand and remember simple instructions, locations, and work-like procedures; she can understand and remember detailed instructions; [and] she can carry out short and simple and detailed instructions." R. 36. The ALJ concluded:

> However, I have considered the effect the claimant's
> impairments on her ability to perform the mental
> requirements of work as set out in SSR 85-15. This ruling
> notes that an individual should be able to understand, carry
> out and remember simple instructions; respond
> appropriately to supervision, coworkers and usual work
> situations; and to deal with changes in a routine work
> setting. Thus, these are the activities I considered in
> reaching the claimant's residual functional capacity when
> finding a moderate limitation in all four broad areas of
> mental functioning accommodated by the following: she
> can understand, remember, and carry out detailed, but not
> complex instructions; she cannot perform work requiring
> a specific production rate, such as assembly line work, or

> work that requires hourly quotas; she can tolerate
> occasional interaction with the public, and occasional
> interaction with coworkers and supervisor; she can deal
> with occasional changes in the work setting.

R. 37.

The ALJ properly identified Ms. Jones's functional limitations and assessed "her work-related abilities on a function-by-function basis." SSR 96-8p at *1. In accordance with the ruling, the ALJ's residual functional capacity finding "contain[ed] a thorough discussion and analysis of the objective medical and other evidence," "[i]nclude[d] a resolution of any inconsistencies in the evidence as a whole," and "[s]et forth a logical explanation of the effects of the symptoms" on Ms. Jones's "ability to work." *Id.* at *7.

Additionally, Ms. Jones's argument regarding the mental functions in the residual functional capacity reflects a misreading of the record. Although Ms. Jones argues that she was "limited to carry out 'very short' and simple instructions," the cited record evidence specifically states that she can "carry out . . . detailed instructions." Doc. 11 at 9; R. 97; *see also* R. 37; R. 96 ("Claimant understands and remembers simple instructions as well as locations and work-like procedures. She demonstrates the ability to understand and remember detailed instructions.").

The conditions in the residual functional capacity were well-explained and well-supported by medical evidence. The court discerns no error in the ALJ's residual functional capacity analysis.

24

### C. The ALJ's Step Five Finding

At the *fifth* step of the disability determination, the Commissioner must show "the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Hale v. Brown*, 831 F.2d 1007, 1011 (11th Cir. 1987). In making this determination, the ALJ may take administrative notice of job data and may use vocational expert testimony. 20 C.F.R. § 404.15.66(d), (e); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (stating that when the claimant cannot perform a full range of work or has non-exertional impairments that significantly limit basic work skills, the primary method for determining whether the claimant can perform other jobs is through vocational expert testimony).

Ordinarily, vocational expert evidence should be consistent with the DOT. Social Security Ruling 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("SSR 00-4p"). When a vocational expert's testimony conflicts with the DOT, there are certain duties that the ALJ must discharge.

Ms. Jones argues that the ALJ erred when he "fail[ed] to reconcile an apparent conflict" based on the ALJ's finding regarding Ms. Jones's ability to follow certain instructions. Doc. 11 at 10–13. The Commissioner again argues that Ms. Jones's "misread[s] . . . the record" with respect to her ability to carry out instructions and thus her "argument regarding an 'apparent conflict' between the [DOT] and the vocational expert's testimony must fail." Doc. 15 at 12–13.

The court agrees with the Commissioner. Although Ms. Jones argues that there is an apparent conflict, the cited record evidence specifically states that she can "carry out . . . detailed instructions." Doc. 11 at 12; R. 97; *see also* R. 37. Thus, the ALJ did not err in his step five analysis.

### D. The ALJ's Hypothetical Questioning of the Vocational Expert

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Ms. Jones argues that the ALJ "fail[ed] to account for a finding that [Ms. Jones] has moderate restrictions in concentration, persistence, or pace in the accepted hypothetical to the vocational expert." Doc. 11 at 13. Instead, Ms. Jones argues that "the accepted hypothetical to the [vocational expert] only limited [Ms. Jones] mentally to understand, remember, and carry out detailed but not complex directions; no work with a specific production rate such as an assembly line or work that requires hourly quotas; occasional interaction with the public, co-workers, and supervisors; and dealing with no more than occasional changes in the work setting." *Id.* at 14 (citing R. 80–91). The Commissioner argues that "a plain reading of the

ALJ's decision supports the hypothetical and the conclusions," Ms. Jones "has not meaningfully argued that the [residual functional capacity] is insufficient to account for her limitations," and "her reliance on caselaw is misplaced." Doc. 15 at 15. Instead, the Commissioner argues that "the ALJ explicated accounted for the moderate limitation in concentration, persistence, or maintaining pace in the [residual functional capacity] finding." *Id.* at 18.

In his decision, the ALJ first addressed Ms. Jones's mental impairments in his listing determination, specifically evaluating Ms. Jones's ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. R. 23–27. The ALJ defined "moderate limitation" under the listing as: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." R. 24. After discussing Ms. Jones's hearing testimony, the objective medical evidence, and daily activities, the ALJ found that Ms. Jones has a moderate limitation in all four areas. R. 24–26. The ALJ also wrote:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

27

R. 27.

In the next step of his decision, the ALJ made his residual functional capacity determination. R. 27–39. The ALJ specifically detailed Ms. Jones's mental impairments, including inpatient care with no evidence of follow-up outpatient treatment, R. 31–32, primary care records and examination records, R. 32, and psychological consultative examination results, R. 32. The court detailed the ALJ's residual functional capacity determination *supra* Section IV.B and did not discern an error.

The ALJ also discussed the medical opinions of Dr. Sadovnik, Dr. Bare, and Dr. Bynum, and indicated how persuasive he found these opinions and his reasons for that determination. R. 36–38. The ALJ again referenced "finding a moderate limitation in all four broad areas of mental functioning," and he noted that he considered Ms. Jones's "ability to perform the mental requirements of work as set out in SSR 85-15 . . . in reaching [her] residual functional capacity." R. 37.

At the hearing, the ALJ questioned the vocational expert:

> Q      Please assume a hypothetical person the same age, education, past work experience as the claimant, with the following limitations. The person is capable of light work as defined in the regulations. The person cannot climb ladders, ropes and scaffolds. Person can frequently stoop, occasionally kneel, crouch and crawl. Person can occasionally be exposed to extreme cold, extreme heat. Can occasionally be exposed to excessive irritants such as fumes, odors, dust, gasses, poorly ventilated areas and

chemicals, as defined in the Selected Characteristics of Occupations of the DOT. The person cannot be exposed to workplace hazards such as moving mechanical parts and high exposed placed. Person's vision is such that they can avoid ordinary hazards in the workplace like boxes on the floor, doors ajar and so forth. The person can understand, remember and carry out detailed but not complex instructions, but cannot perform work that requires a specific production rate such as assembly line work or work that requires hourly quotas. The person can tolerate occasional interaction with the public and with coworkers and supervisors. And the person can deal with occasional changes in the work setting. With those limitations, past work would be eliminated. Is that correct?

A    Yes, sir.

Q    Could you name some jobs in [t]he national economy a person could perform with those limitations?

A    Well, there would be Cleaner-Housekeeping . . . Garment Sorter[.]

R. 80–81.

The ALJ properly evaluated Ms. Jones's mental functioning in both his listing determination and in his residual functional capacity determination. *See supra* Section IV.B (rejecting plaintiff's residual functional capacity argument). The ALJ thoroughly examined the record and explained his decision making. The hypothetical question posed to the vocational expert incorporated all the limitations included in the residual functional capacity. Therefore, substantial evidence supports the ALJ's determination that "other work . . . exists in significant numbers in the national economy." *See* R. 41.

29

### E. The ALJ's Evaluation of Ms. Jones's Subjective Statements

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating

and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7–*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

This determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v.*

*Chater*, 933 F. Supp. 1071, 1076 (S.D. Fla. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Ms. Jones argues that "[t]he ALJ's evaluation of [her] subjective statements is not supported by substantial evidence" because "there are extensive clinical and objective abnormalities that support a finding of physical and/or mental disability for [her] based on the available medical opinions." Doc. 11 at 17. Additionally, Ms. Jones argues that the ALJ erred when referring to her activities of daily living. *Id.* The Commissioner argues that "[t]he ALJ properly considered all relevant evidence, including the objective medical evidence, the prior administrative medical findings, and [Ms. Jones's] admitted daily activities and determined that this evidence was not entirely consistent with [her] subjective statements about the levels of intensity, persistence, and limiting effects of her impairments." Doc. 15 at 19.

It is clear the ALJ applied the Eleventh Circuit's pain standard. After explaining the pain standard, with citations to 20 C.F.R. § 404.1529 and SSR 16-3p, the ALJ considered Ms. Jones's testimony about her symptoms. *See* R. 27–28. With respect to Ms. Jones's hearing testimony, the ALJ summarized it as follows:

> At the hearing, the claimant endorsed ongoing impairment related symptoms such as, but not limited to low vision, neck and back pain radiating to extremities, generalized fibromyalgia body pain, limited ability to stand, walk, or sit for prolonged periods, shortness of breath exacerbated by temperature extremes, allergies, and walking, recurrent migraines with light and noise sensitivity, abdominal pain with frequent need to use the restroom, difficulty concentrat[ing], being around[] others, completing tasks, anxiousness, nervousness, and panic attacks. She estimated that she can [sit] for no more than 20 minutes, walk for about 20 to 30 minutes, and lift no more than a gallon of milk. She also stated that she needs to lie down throughout the day and elevate legs 3 to 4 times a day for 30 minutes each time. The claimant further stated that she is currently enrolled and taking classes for medical billing and coding and is able to read, write, and use a cell phone.

R. 28; *see also* R. 64.

"After careful consideration of the evidence," the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 28; *see* R. 29–33 (chronological discussion of medical evidence). The ALJ then found that Ms. Jones's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 28. The ALJ stated that "[t]he objective medical evidence supports that the claimant has severe impairments of degenerative disc disease, fibromyalgia, loss of central visual acuity, depression, bipolar disorder, anxiety disorder, and amphetamine use disorder." R. 29. The ALJ also found that "obesity is a severe impairment." R. 29.

33

The ALJ continued: "However, the evidence does not fully support that the claimant is as limited as alleged. Rather, the evidence supports that the claimant retains a residual functional capacity for a light exertion with the . . . postural and non-exertional functions" given here. R. 29.

The ALJ limited Ms. Jones to light work "[c]onsistent with the evidence . . . and considering the effects of her medically determinable impairments along with her obesity . . . and demonstrated normal strength." R. 33. In imposing additional limitations on light work, the ALJ took "into account the effects of her obesity on postural and non-exertional functions, along with possible symptom exacerbating factors, and safety precautions." R. 33. And in imposing certain mental functioning limitations, the ALJ considered Ms. Jones's "reported mental impairment related symptoms, despite normal mental status exams." R. 34.

The ALJ properly evaluated Ms. Jones's symptoms consistent with the Eleventh Circuit's pain standard and his decision was supported by substantial evidence. After discussing Ms. Jones's testimony, R. 28, the ALJ summarized the medical evidence, R. 29–33. The medical evidence cited by the ALJ – generally unremarkable findings and routine and conservative treatment – supports the ALJ's finding that Ms. Jones's allegations of disabling limitations were not fully consistent with the evidence. Additionally, in accordance with the regulations, the ALJ's consideration of Ms. Jones's activities of daily living was appropriate.

The ALJ acknowledged Ms. Jones's medical history and testimony and accounted for Ms. Jones's subjective complaints when he determined Ms. Jones was limited to light work with additional limitations. Accordingly, there is no error in the ALJ's consideration of Ms. Jones's subjective complaints.

## V.    Conclusion

The ALJ's determination that Ms. Jones is not disabled is supported by substantial evidence. The Commissioner's final decision is therefore affirmed. A separate order will be entered.

**DONE** and **ORDERED** this 20th day of January, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE